THE EXECUTORS OF EDWARD W. CONDICT *vs.* ESTHER A. KING and others.

The expression in a will "dying without lawful issue," under a well settled rule of law, imported an indefinite failure of issue.

Personal property could not be limited over on so remote a contingency, and consequently under such a gift of a personal chattel the legatee took the absolute property.

But by the New Jersey statute of March 12th, 1851, the words "dying without issue" and similar expressions are made to denote a definite failure of issue, so that the will of a person dying since that act went into effect, thus limiting personal property, will pass to the legatee only a defeasible interest, which will cease upon his dying without leaving issue at his death.

Where one legacy is given as a mere substitute for another the substituted gift is subject to the incidents of the original gift, although not so expressed in the testamentary instrument.

On bills of interpleader the court disposes of the questions arising in various modes, according to the nature of the question and the manner in which it is brought before the court.

If at the hearing the question between the defendants is ripe for decision the court will decide it and pronounce a final decree.

*Dalrimple*, for complainants.

*Vanatta*, *Bradley*, and *Williamson*, for defendants.

THE CHANCELLOR. The controversy in this case arises upon the true construction of the will of Edward Condict. By the third clause of his will, the testator having devised to his grandson, Edward W. Condict, certain real estate, directs as follows: "In the event of the death of my grandson without lawful issue, it is my will that that part of my estate herein before devised to him, and also that part of my estate to which he may be entitled as a residuary legatee, be divided between my two daughters, Phebe and Mary Ann, their heirs or assigns." By the residuary clause of his will, the testator bequeathed to his grandson "the one-tenth of the residue of his estate, to be paid to him or his guardian."

As the law stood prior to recent statutory enactments, by the provisions of this will, the legatee took an estate tail in the land and an absolute interest in the personal property. By well settled rules of construction, "dying without lawful issue" was construed to mean an indefinite failure of issue, not a failure of issue at the death of the first taker, but at any future period, however remote. Such limitation over created an estate tail in the devisee in real estate. But because the law would not permit personal property to be entailed nor to be limited over upon so remote a contingency, under such a gift of personal chattels the legatee took an absolute property. 2 *Kent's Com.* 354; 2 *Roper on Leg.* 1522.

By the act of March 12th, 1851, (*Nix. Dig.* 877, § 27,) it was enacted that "in any devise or bequest of real or personal estate in the will of any *person dying after this act shall take effect* the words 'die without issue,' or 'die without lawful issue,' or 'have no issue,' or any other words which may import a want or failure of issue of any person in his lifetime, or at his death, or an indefinite failure of his issue, shall be construed to mean a want or failure of issue in the lifetime or at the death of such person, and not an indefinite failure of issue, unless a contrary intention shall otherwise appear by the will." Under the rule of construction thus established the will gave to the son of the testator an estate in fee in the land, liable to be defeated upon his death without issue, with an executory devise over in fee to the daughters of the testator.

This rule of construction, although it changed the estate in the land devised to the son of the testator from an estate tail to a defeasible estate in fee, in no wise affected the interest of the daughters in the real estate. Upon either construction, upon the death of the first devisee without lawful issue the real estate went to the daughters in fee. But its effect upon the disposition of the personal estate was to change the absolute gift of the

property to the grandson into a gift of a qualified interest, which became absolute only upon his leaving issue at the time of his death. He held during his life only a defeasible interest in the personal property, which upon the contingency of his dying without issue vested in the daughters of the testator.

Such limitation over of an executory interest in personal estate is clearly valid. 2 *Kent's Com.* 352.

This must be the construction of the testamentary disposition under the act of 1851, unless a contrary intention appears by *the will*.

The fact that the will was executed before the act took effect cannot alter its construction. If that were to be the test, the act itself would have applied the statutory rule of construction only to wills *that were executed* after the act took effect, whereas, by its terms, it applies to all wills where the *testator dies* after the act took effect.

It does, indeed, seem to be a remarkable rule of construction that determines the meaning of the testator to be the very reverse of the legal effect of his language at the time the will was written. If the testator had died the next day or the next year after the will was made, it is clear that, by the rule of law as then settled, the grandson would have taken the personal property absolutely and the limitation over would have been void. If the testator, when he executed the will, had inquired of the scrivener or the counsel who drew it, he must have been told that the legatee took the personal property absolutely. And although there was a republication of the will by a codicil after the act went into effect, it is obvious to observe that the testator republished it according to its legal effect, as he understood it, at the time it was executed. It cannot be denied, therefore, that it is a reasonable inference not only that the testator understood the legal effect of the terms used by him, but that his intention was precisely in accordance with the legal effect of the terms

2 I*

he employed, *viz.* to give the personal estate absolutely to his grandson.

But, on the other hand, it must be borne in mind that the legislature altered the rule of construction formerly adopted by the courts upon the very ground that, as applied to the terms used in this will, it was an artificial and technical rule, which defeated the real intention of the testator. They therefore declared that in the construction of all wills in future, except where rights had already become vested by the death of the testator, a different rule of construction should prevail. Unless, therefore, a contrary intention shall otherwise appear by the will, the court is clearly bound to adopt the construction provided by the statute.

It is urged that the fact, that the testator, by the will, directed the share of the residue bequeathed to the legatee "to be paid to him or his lawfully appointed guardian," indicates an intention to give him the absolute property. But the legatee was clearly entitled to the use of the property for his life, and the executor would have been bound to pay it to him without such direction. The design of the instruction may well have been to relieve the executor from all doubts as to the propriety of placing the money in the hands of the legatee, and from all responsibility for so doing. It certainly did not change the legal effect of the will, or the rights of the legatee under it.

Again, it is urged that the provisions of the eleventh clause of the will, by which, in a certain contingency, the expenses of educating the legatee, and bringing him up "to maturity" shall be paid out of that part of the testator's estate given and devised to the legatee, indicates an intention to give him the property absolutely. It is said that this gives the legatee the use and disposal of the property for the purposes of his bringing up and education, which necessarily involves the right of absolute ownership and defeats the gift over to the testator's daughters.

The eleventh clause of the will recites that the legatee,

the testator's grandson, since the death of his father lived with his maternal grandfather, Jason King, for which, under an agreement between Mr. King and the testator, Mr. King was to receive and had received the rents and profits of a house and garden belonging to the testator; and it is therefore directed that, should Mr. King demand anything more as a compensation for his expenses in keeping and educating his said grandson, such additional expense or compensation, together with the expense of bringing him up until he arrives at maturity, should be paid out of that part of the testator's estate given and devised to his grandson.

The effect of this clause is to diminish, on the occurring of a certain contingency, the amount of the legacy, not to alter the character of the bequest or to control the use of it in the hands of the legatee. It is tantamount to saying, if a demand is made upon me or upon my estate to pay any portion of educating or bringing up the legatee till he arrives at maturity, such sum shall be deducted out of his portion of my estate. No such demand was ever made.

The utmost effect that can be given to this clause is to diminish the amount given to the grandson and limited over to the daughters of the testator to the extent of the expenses incurred by him in his education. This will be in accordance with the intention and wish of the testator. The primary purpose of the provision clearly was to guard his estate from any claim for the maintenance or education of his grandson beyond the amount already contributed and that given in the will. He appears to have supposed that he had already contributed to that object as far as he had agreed, or could fairly be required to do, and to have expected that whatever more might be required for that purpose would be contributed by Mr. King. As the *paternal* grandfather, he was under no higher obligation to maintain the legatee than his *maternal* grandfather was. The legacies, therefore, were not

made for the purpose of educating his grandson. At the same time there was a manifest expectation and purpose on the part of the testator that his grandson should be educated, and so far as the expense was not borne by his maternal grandfather, that it should be deducted from the property given by the will. The testator, as a man of character and property, must have contemplated that the sole representative of his only son should be educated according to his station and circumstances in life. The fund is charged not only with the compensation that should be demanded by Mr. King, but also with the expense of bringing him up until he arrives at maturity. It would be an unworthy reflection upon the memory of the testator to hold that by "bringing up" his grandson, he simply intended he should be clothed and fed. He doubtless intended that his bringing up should include an education according to his inclination and capacities and suited to his situation and circumstances in life. Nor could he have intended to limit this provision to the period of the minority of his grandson, and to have him turned upon the world at twenty-one with his education half finished and his mind immature. That is neither the necessary import nor the fair construction of the testator's language. The term "maturity" is not synonymous with legal majority. As used by the testator, it may well be held to import maturity of mind and character, the combined result of age and education. The money actually expended by Edward W. Condict in his education, either before or after he attained the age of twenty-one, should be deducted from the amount for which his estate is liable to the legatees under his grandfather's will. In regard to the amount expended by Mr. King there is more difficulty. No demand of the repayment of that money appears to have been made, either by Mr. King or by his legal representatives, after his death. Mr. King died in 1853. The legatee attained his majority on the 16th of January, 1855. His grandfather, Edward Condict, died on the first of

December following. Upon the evidence now before the court there is no claim, legal or equitable, upon the estate of the testator for the repayment of the moneys advanced by Mr. King or his estate for the support or education of the legatee. Nor do I see any ground upon which such claim can be maintained, either against the estate of Edward Condict or his grandson, Edward W. Condict. If this money was never claimed by Mr. King or his estate from Edward W. Condict it must be presumed to have been voluntarily advanced by him for the benefit of his grandson, and there can be no equity in now charging it upon his estate for the mere purpose of diminishing the fund in his hands belonging to the legatees under the will of Edward Condict. If the existence of such claim can be established, the defendant, Miss King, will be permitted to offer evidence for that purpose; but if no such evidence exists, this part of her claim must be rejected.

One of the lots devised by the will of Edward Condict to his grandson, Edward W. Condict, was afterwards sold by the testator, and a bond and mortgage taken for the purchase money. By the third codicil to his will, bearing date in 1854, this bond and mortgage were specifically bequeathed to the devisee in lieu of the land so sold without any limitation over to the testator's daughters. The bond and mortgage are given as a mere substitution for the land. The fact that there was an ademption of the gift by a sale of the land before the date of the codicil does not change the substance of the thing. He gave the bond and mortgage as a substitute for the land which was devised, and subsequently sold by the testator.

Where one legacy is given as a mere substitute for another, the substituted gift is subject to the incidents of the original, although not so expressed in the testamentary instrument. 2 Wms. on Executors 1112; Shaftesbury v. Marlborough, 7 Simons 237; Chatteris v. Young, 2 Russell 183; 1 Jarman 170.

The principle cannot be universally applicable where a legacy is given as a substitute for a *devise* of real estate. Real and personal estate, by the terms of the will, may be given subject to different incidents. But in this case the real and personal estate are both limited over in the same way. The codicil contains an express republication of the original will. It must have been the intention of the testator that the bond and mortgage should be limited over to his daughter in the same manner as the land for which it was substituted. The estate of Edward W. Condict must account to the daughters of the testator for the value of the mortgage.

The price for which the mortgaged premises were sold, less the costs of the foreclosure and sale, would be *prima facie* evidence of its true value, though not conclusive. In the absence of fraud or collusion, Edward W. Condict or his estate would be entitled in equity to hold the property at the price at which it was purchased by him, though the deed was not actually delivered. The conveyance by the sheriff to Miss King of property struck off and sold to Edward W. Condict was illegal, and vested no valid title in the grantee. She can claim nothing by virtue of that deed.

The estate of Edward W. Condict must account for the price at which the land was sold, or if the sale was made by fraud or collusion, for the real value of the premises at the time of the sale by the sheriff, less the costs and expenses. The money advanced by Miss King to the sheriff, or otherwise on account of the sale, must be refunded, and the net value of the mortgage accounted for to the daughters of the testator, Edward Condict.

The executor of Edward W. Condict is not bound to return the specific articles purchased with the money received for the estate. Nor is he bound to account for the rents of the real estate or the income and profits of the personal estate accruing between the death of his grandfather (or as to the residue a year afterward) and his

own death. The true measure of accountability is the value of the personal property received by Edward W. Condict under the bequests in the will. As to the residue, *that* was converted into money, and the precise amount is ascertained. It was properly paid over to him by the executor without requiring security. Where a legacy is given generally, subject to a limitation over upon a subsequent event, the divesting contingency will not prevent the legatee from receiving his legacy at the end of the year from the testator's death; and he is not bound to give security for the repayment of the money in case the event should happen. *Griffiths* v. *Smith,* 1 *Vesey, jr.* 97; *Fawkes* v. *Gray,* 18 *Vesey* 131; 2 *Williams on Ex'rs* 1192; *Homer* v. *Shelton,* 2 *Metc.* 194; *Fiske* v. *Cobb,* 6 *Gray* 144.

As to the mode of proceedings or the form of the decree there can be no difficulty. The court disposes of the questions arising upon bills of interpleader in various modes according to the nature of the question and the manner in which it is brought before the court. If at the hearing the question between the defendants is ripe for decision the court decides it and pronounces a final decree. This course was adopted in the greatly contested case of *Hendrickson* v. *Decou, Saxton* 593, and in *Rowe* v. *Adm'rs of Hoagland,* 3 *Halst. Ch. R.* 139.

If at the hearing the case is not ripe for decision the court directs an action or an issue, or a reference to a master, as may be best suited to the nature of the case. *Angell* v. *Hadden,* 16 *Vesey* 203; *Seaton's Decrees* 340; *City Bank* v. *Bangs,* 2 *Paige* 570; 3 *Daniels' Ch. Pr.* 1765.

If the amount to which, upon the foregoing principles, the legatees of Edward Condict are entitled out of the estate of Edward W. Condict can be agreed upon there will be no necessity for an order of reference, but a final decree may be at once made. If this amount cannot be thus ascertained there must be a reference to a master with instructions.